# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 10-145 |
| | ) | Judge Nora Barry Fischer |
| MELVIN HARRIS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is a motion to suppress evidence filed by Defendant Melvin Harris ("Defendant") on February 13, 2012.[1] (Docket No. 101). Defendant seeks to suppress body wire interceptions of conversations that he had with an informant which the Government will seek to admit into evidence at the trial of this case. (*Id.*). He claims that the body wire interceptions were made in violation of federal law as the informant allegedly did not consent to be a party to the intercepted conversations. (*Id.*). The Government opposes Defendant's motion. (Docket No. 117).

Pre-hearing briefs were submitted by both parties and a suppression hearing was held on June 12, 2012. (Docket Nos. 101, 117, 124). The transcript of said hearing has been produced and fully considered by the Court. (Docket No. 131). The Court also ordered the parties to submit proposed findings of fact and conclusions of law and provided a deadline for the submission of responses to same. (Docket No. 125). The Government filed its proposed

---

[1] The Court notes that Defendant has also filed four additional pretrial motions which remain pending before the Court, i.e., his: Motion for Discovery With Citation of Authority (Docket No. 102); Motion to Produce Evidence Which the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609 With Citation of Authority (Docket No. 103); Motion for Notice by the Government of Its Intention to Use Evidence Arguably Subject to Suppression (Docket No. 104); and his Motion to Compel Notice by the Government of Its Intention to Use Certain Evidence (Docket No. 105). The Court will issue separate orders setting forth the disposition of these motions.

findings of fact and conclusions of law on August 14, 2012. (Docket No. 140). After two extensions of time were granted, Defendant filed his proposed findings of fact and conclusions of law on September 18, 2012. (Docket No. 146). The Government then filed its response to Defendant's proposed findings of fact on October 10, 2012.[2] (Docket No. 147). No further filings have been made and the motion is now ripe for disposition.

Upon consideration of the parties' submissions, the evidence presented during the motion hearing and for the following reasons, Defendant's motion to suppress [101] is denied.

## II. BACKGROUND

### A. Charges and Potential Penalties

Defendant was charged by Indictment with one count of conspiracy to possess with the intent to distribute and distribute five grams or more of a mixture and substance containing a detectable amount of cocaine base, in the form commonly known as crack, in violation of 21 U.S.C. § 846, for conduct occurring on May 1, 2008. (Docket No. 1). The Government filed an Amended Indictment Memorandum on August 10, 2011, indicating that the reduced penalties of the Fair Sentencing Act of 2010 apply to this case. (Docket No. 72). As such, the potential penalties in this case are set forth in 21 U.S.C. § 841(b)(1)(C), which provides that, upon a first conviction for a felony drug offense, Defendant may be subject to a term of imprisonment of up to twenty (20) years. 21 U.S.C. § 841(b)(1)(C). However, if this is a second or subsequent

---

[2] The Court notes that the initial deadline for the parties' submission of findings of fact and conclusions of law was August 20, 2012 and responses, if any, were ordered to be filed by September 21, 2012 or within 31 days. (Docket No. 125). The Government filed its findings of fact and conclusions of law early, on August 14, 2012, (Docket No. 140), but defense counsel requested two extensions of time to submit his proposed findings of fact and conclusions of law, which the Court granted, and this submission was ultimately made on September 18, 2012, (Docket No. 146). The parties did not move the Court for an extension of time for the filing of responses but the Government filed its responsive brief on October 10, 2012. (Docket No. 147). Given that this filing was made within the 31-day period afforded for responses in the Court's initial order, and the prior extensions granted to the defense essentially permitted his proposed findings of fact and conclusions of law to be filed more than 30 days after the Government's submission, the Court will accept the Government's response although it is technically filed late. However, the Court suggests that better practice would be to seek leave of court prior to making a submission outside the deadlines set forth in Court orders.

felony drug offense, Defendant may be subject to a term of imprisonment of not more than thirty (30) years. *Id.*

### B. Findings of Fact[3]

At issue in this case is whether the informant voluntarily consented to wear the equipment that was used to intercept his conversations with the Defendant. The informant did not testify at the suppression hearing as the Government declined to present this individual as a witness and the Court denied Defendant's motion to produce this individual at that hearing based on a finding that Defendant had not met his burden to overcome the Government's invocation of its privilege to withhold this individual's testimony at this time. (Docket No. 123). Instead, the Government presented the facts and circumstances of the informant's activities through the testimony of Pittsburgh Police Detective and Drug Enforcement Administration ("DEA") Task Force Officer Fred Woodward, whom this Court found credible.

The credible evidence offered at the June 12, 2012 suppression hearing, including the testimony of Officer Woodward and the documentary exhibits entered into evidence, (Govt. Ex. 2A), established the following facts. (*See* Docket No. 131).

Officer Woodward has significant experience in law enforcement. (Docket No. 131 at 6). He has been a Pittsburgh Police Detective for the past 19 years. (*Id.*). In 2001, he started working with DEA on a case-by-case basis. (*Id.*). Later, in 2006, he became a full-time Task Force Officer with DEA. (*Id.*). He remains a Pittsburgh Police Detective. (*Id.* at 24). Officer Woodward has worked with informants on many occasions in both roles. (*Id.* at 6). As such, Officer Woodward testified that he is familiar with the protocols for signing up informants that

---

[3] It is well-settled that at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Hill*, Cr. No. 07-371, 2008 WL 2367185, at *5 (W.D. Pa. 2008) (quoting *United States v. Richardson,* 501 F. Supp. 2d 724, 734 (W.D.Pa. 2007) (citations omitted)).

must be followed by the City of Pittsburgh Police and the DEA. (*Id.* at 23-26, 47). Officer Woodward explained that the requirements placed on law enforcement signing up informants by the DEA are more onerous than the City's processes and procedures given that there are additional levels of bureaucracy in the federal government. (*Id.* at 23-26, 28). As is discussed below, the informant in this case was signed up as an informant for the City of Pittsburgh Police rather than DEA. (*Id.* at 9-10, 23-24).

The informant was arrested near the end of 2007 by Pittsburgh Police Officer David Lincoln. (*Id.* at 7). The arrest stemmed from a traffic stop by Officer Lincoln and a subsequent search during which the informant was found in possession of approximately one ounce of cocaine and possibly a firearm. (*Id.* at 7, 8, 41). The informant was charged with possession of cocaine in state court. (*Id.* at 8). At the preliminary hearing in that case, the informant, who was represented by counsel, expressed to Officer Lincoln that he wished to cooperate with law enforcement. (*Id.*). Officer Lincoln then contacted the DEA through Officer Woodward to determine whether the agency was interested in working with this individual as an informant. (*Id.* at 9). A meeting was subsequently set up with the informant, Officer Woodward, and Officer Lincoln at the DEA's offices on November 20, 2007. (*Id.* at 30). Officer Woodward testified that the informant's attorney did not attend the meeting but expounded that Officer Lincoln would have consulted with the attorney before the meeting. (*Id.* at 56-57).

Officer Woodward described the informant as middle-aged. (*Id.* at 75). He was unaware of his or her educational background. (*Id.* at 76). But, he explained that the informant was fairly articulate and was able to read and understand paperwork that the officers had provided to him or her during their meetings. (*Id.*). Officer Woodward was aware that this individual had prior convictions and involvement with narcotics. (*Id.* at 52). He further testified that while he did not

4

conduct a drug or alcohol test of this individual, based on his experience dealing with intoxicated individuals, the informant was not under the influence of alcohol or narcotics during any of their conversations. (*Id.* at 52, 53, 75-76).

Officer Woodward's first interaction with the informant was during the November 20, 2007 debriefing session. (*Id.* at 43). The debriefing was set at a mutually convenient time for the informant and the officers. (*Id.* at 11). The informant arrived at the DEA office voluntarily. (*Id.* at 10). The informant was not in custody at that time and was also not restrained by handcuffs or shackles during the debriefing. (*Id.* at 11). The debriefing took place in an interview room rather than a prison cell, police station or another more intimidating location. (*Id.*).

Officer Woodward testified that the informant voluntarily provided information concerning Defendant's alleged drug distribution activities during the debriefing as well as information concerning the illegal activities of other individuals. (*Id.* at 9-10). Woodward further explained that the fact that the informant presented the names of individuals allegedly involved in criminal activity (including Defendant's) to law enforcement rather than the officers suggesting targets to the informant was typical of the debriefings he has been involved in. (*Id.*). He later denied that Officer Lincoln had suggested to the informant that he specifically provide information concerning Defendant to the officers. (*Id.* at 54). The specific information provided by the informant regarding Defendant at the initial debriefing was that he was involved in the distribution of marijuana and cocaine. (*Id.* at 10). The informant also told the officers that he may be able to make a controlled purchase of narcotics from Defendant. (*Id.*).

Given the information that the informant provided about the Defendant and other individuals, the officers determined that the informant would be of assistance in at least one

5

investigation. (*Id.*). They did not have the informant complete any "proactive work" that day such as making recorded calls or controlled buys. (*Id.* at 11). Instead, the officers initiated the process to sign up this individual as a City of Pittsburgh Police Weed and Seed informant. (*Id.* at 9, 10, 23). This process included the individual providing all of the following: personal information; photographs; and fingerprints. (*Id.* at 11). The informant is also required to sign an agreement with law enforcement. (*Id.*). The actual written agreement with the informant in this case was not entered into evidence by the Government.[4] (*Id.* at 27). As to the general content of such agreements, Officer Woodward testified that the informant agrees that his or her cooperation is voluntary, disclaims that any promises were made in consideration for the cooperation, and concurs that he or she will not engage in any illicit or illegal behavior to further his or her cooperation unless specifically directed to do so by law enforcement. (*Id.* at 11-12). Officer Woodward stressed that law enforcement agents do not have the authority to make any promises to an informant in exchange for their cooperation, including any promises concerning the potential dismissal of charges against them or leniency in sentencing. (*Id.* at 46).

With respect to the agreement in this case, Officer Woodward testified that the informant read and acknowledged that he or she understood the contents of the agreement. (*Id.* at 76). This individual also initialed every line of the agreement and signed it voluntarily. (*Id.*). Woodward explained that the contents of the letter executed by the informant were akin to the typical standard form described above. (*Id.* at 11-12). He affirmed that he did not make any promises to Defendant or threaten to make the state case against this individual worse through filing additional charges or any other action. (*Id.* at 12).

---

[4] Officer Woodward testified that the agreement with the informant in this case does exist but he posited that the agreement constituted *Jencks* material and that it would likely be produced to the defense at a later stage of the proceedings after consultation with the Assistant United States Attorney. (Docket No. 131 at 27).

Woodward also testified that as a general matter promises are never made by law enforcement officers to informants, emphasizing that only the District Attorney or United States Attorney could make binding agreements with cooperators. (*Id.* at 46). But, he admitted that he was not aware if Officer Lincoln or any other law enforcement officer made any such promises to the informant used in this case or made any threats to the informant outside of his presence. (*Id.*). Woodward further denied that he knew of the potential sentence faced by the informant in state court or if this individual received any favorable treatment in state court due to his cooperation with law enforcement such as his sentence being substantially reduced. (*Id.* at 42, 47). Woodward likewise admitted that the City of Pittsburgh Police protocol for signing up informants would have at some point involved the informant meeting with Deputy Assistant Attorney Dick Goldberg and possibly the case agent, Officer Lincoln. (*Id.* at 45). Officer Woodward was not aware of whether such a meeting with the instant informant ever occurred but he affirmed that there is nothing unusual about an informant who cooperates with law enforcement in order to work off some type of charge in hope of a reduced sentence. (*Id.*).

Despite the fact that the informant was signed up on November 20, 2007, the second meeting between the officers and the informant did not occur until nearly five months later, on April 10, 2008. (*Id.* at 70; Govt. Ex. 2A). The informant participated on that day by making recorded phone calls to one or both of the codefendants in this case for the officers. (Docket No. 131 at 15, 70).

The next interaction with the informant was a few weeks later, on May 1, 2008. (*Id.* at 13). On that day, the informant met law enforcement officers at a predetermined location in a public area for the purpose of making recorded phone calls to the Defendant. (*Id.* at 13, 16). The informant arrived at the meeting by himself. (*Id.* at 13). Woodward confirmed that the

informant was not brought to the site by police and was not in custody or restrained by handcuffs. (*Id.*). The informant agreed to use a digital recording device to record the phone call. (*Id.* at 14). He did not attempt to take off, avoid or thwart the device. (*Id.*). Indeed, Woodward stated that the recordings were relatively clear as compared to other similar digital recordings he has heard. (*Id.*).

After the recorded phone calls were completed, the informant agreed to be outfitted with a digital recording device to be worn during the controlled purchase. (*Id.* at 16-17). Woodward testified that he did so voluntarily and assured that "[i]t would have had to [have] been voluntary" for them to outfit him with the recording device. (*Id.* at 17). He further explained that the informant wore the device "in a good place" in order to assure a clear recording. (*Id.*). Woodward also confirmed that quality recordings were again made. (*Id.*).

Later that day, the informant wore this device during an in-person meeting with Defendant and codefendant, Vincent Bostic. (*Id.* at 18). He then got into his car and followed Bostic to a Boston Market. (*Id.*). While the informant was alone in his car, he continued to wear the recording device and did not make any attempts to disable it. (*Id.*). He also placed a telephone call to the officers in order to maintain contact with them while he was following Bostic. (*Id.*). The controlled purchase from Bostic was then recorded on the wire worn by the informant. (*Id.*).

Approximately two weeks later, on May 13, 2008, Woodward again met with the informant to show him a photo array of certain individuals. (*Id.* at 18-19, 70). Like before, the informant arrived at and left the meeting "on his own steam." (*Id.* at 19). The informant again met with Officer Woodward on June 3, 2008 in an attempt to make additional recorded phone calls. (*Id.* at 71-72). This individual then continued to cooperate with another group of agents

8

on separate DEA investigations. (*Id.* at 19-20, 71). During his conversations with the agents assigned to these investigations, Officer Woodward has never heard any negative comments about the informant, including that this individual: was unwilling to cooperate; failed to do what he/she was directed to do; was unresponsive to the agents; or was not forthcoming. (*Id.* at 20-21).

III. CONCLUSIONS OF LAW

The admission of intercepted communications at trial is governed by Title III of the Omnibus Crime and Control Streets Act of 1968 (the "Act"), 18 U.S.C. §§ 2510-2520. Section 2511(1)(d) of the Act generally makes it illegal for the prosecution to *use* wire or oral communications involving third parties and precludes admission of such illegally obtained material at trial. 18 U.S.C. § 2511(1)(d). Relevant here, section 2511(2)(c) of the Act creates an exception to this general rule by making it lawful for "for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or *one of the parties to the communication has given prior consent to such interception*." 18 U.S.C. § 2511(2)(c) (emphasis added).

> [C]onsent is a question of fact determined from the totality of the circumstances. Under the totality of the circumstances test, consent is not voluntary merely because a person makes a "knowing" choice among alternatives. [*Schneckloth v. Bustamonte*, 412 U.S. 218, 224 93 S. Ct. 2041 (1973)]. The ultimate test of voluntariness is whether, under the circumstances, the consent was an exercise of free will or whether the actor's free will "has been overborne and his capacity for self-determination critically impaired." *Id.* at 225. Consent to a wiretap is not voluntary where "it is coerced, either by explicit or implicit means or by implied threat or covert force." [*United States v. Kelly*, 708 F.2d 121, 125 (3d Cir. 1983), *cert. denied*, 464 U.S. 916, 104 S. Ct. 279 (1983)].

*United States v. Antoon*, 933 F.2d 200, 203-04 (3d Cir. 1991). Several other factors may influence whether consent was voluntarily given: namely, "the youth of the accused, his lack of

9

education or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as sleep or food deprivation." *Antoon*, 933 F.2d at 204 n.6 (citing *Bustamonte*, 412 U.S. at 226). Additionally, consent is not involuntary merely because the informant's "motives were self-seeking, or because he harbored expectations of personal benefit." *Kelly*, 708 F.2d at 125; *see also Antoon*, 933 F.2d at 205 (finding voluntary consent where the informant agreed to cooperate as an informant as a result of his "apprehension of prosecution" and "not any coercive statement or intimidation by any law enforcement official").

The Government bears the burden of proof in establishing that an individual consented to having his or her conversations recorded. *See United States v. Brown*, 2009 WL 1310714, at *2 (W.D. Pa. May 11, 2009) (citing *United States v. Matlock*, 415 U.S. 164, 177, 94 S. Ct. 988 (1974)). This burden of proof may be met with testimonial evidence or circumstantial evidence which demonstrates that the consent was voluntary. *Brown*, 2009 WL 1310714, at *2 (citing *United States v. Davis*, 799 F.2d 1490, 1492 (11th Cir. 1986); *Kelly*, 708 F.2d at 125). None of the above-described factors are alone dispositive and, as such, the Government is not required to prove or disprove each of them. *See Bustamonte*, 412 U.S. at 227. It is the Government's burden to show only that the totality of the circumstances demonstrates that the informant's consent was voluntary. *Id.*

In this Court's estimation, after considering the totality of the circumstances, the Government has met its burden to prove that the informant voluntarily consented to recording the conversations challenged by the defense in this case. *See Brown*, 2009 WL 1310714, at *2. Officer Woodward testified credibly that the informant acted voluntarily throughout all of this individual's many cooperative activities in this case, including consenting to wearing recording

devices and intercepting communications with Defendant on several separate occasions. (Docket No. 131 at 13, 16-19, 43, 56-57, 70-72; Govt. Ex 2A). The evidence of record further demonstrates that this individual freely acted as an informant for law enforcement over a period of more than seven months in the investigation of the Defendant and continued assisting law enforcement in other investigations for an even longer period of time. (Docket No. 131 at 20-21). The broad scope of the informant's activities and the duration of such activities strongly support the Court's finding that the consent given to record the challenged conversations was an exercise of free will by the informant rather than improperly obtained by the officers. *See Bustamonte*, 412 U.S. at 225. In reaching this decision, the Court notes the following.

First, the record demonstrates that the characteristics of the individual were not such that he or she would be unable to freely consent to the cooperation in which he or she engaged. *See Antoon*, 933 F.2d at 204 n.6 (listing individual characteristics which may bear on voluntariness). To this end, Officer Woodward testified that the informant is middle-aged, able to read and write, and fairly articulate. (Docket No. 131 at 52-53, 75-76). Woodward also confirmed that based on his considerable experience, he did not believe that the informant was under the influence of alcohol or narcotics during many meetings with law enforcement. (*Id.* at 52-53). The defense presented no evidence to undermine Woodward's testimony on these points. As such, the Court finds that the informant was certainly able to provide valid consent to wear the wire equipment and intercept the conversations with Defendant. *See Bustamonte*, 412 U.S. at 225.

Second, the evidence presented at the hearing shows that the informant initiated contact with law enforcement and freely assisted them on multiple occasions, providing further support for the Court's ruling. *See Brown*, 2009 WL 1310714, at *2 ("Here, the confidential informant

11

approached government agents about participating in an investigation against defendant and expressed no unwillingness to cooperate."). Officer Woodward explained that it was the informant who approached law enforcement about potentially cooperating and did so with counsel present at a preliminary hearing on state charges. (Docket No. 131 at 8). This individual then willingly attended meetings with law enforcement officers and assisted the investigation of this case on all of the following dates: November 20, 2007, April 10, 2008, May 1, 2008, May 13, 2008 and June 3, 2008. (*Id.* at 13, 16, 18-19, 43, 56-57, 70-72, Govt. Ex. 2A). At the initial meeting in November, the informant provided Defendant's name to law enforcement as an individual who was involved in drug distribution and told the officers that he thought he could make a "controlled buy" of narcotics from Defendant. (*Id.* at 9-10). This individual was then "signed up" as an informant with the City's Weed and Seed Program, a process which included executing a general cooperation agreement wherein he or she acknowledged that all acts taken in furtherance of such cooperation were voluntary. (*Id.* at 11-12, 27, 76).

Third, the facts developed by the Government convince the Court that the informant was not subject to any type of overbearing investigative techniques by law enforcement which would support a finding that the consent was coerced. *See Antoon*, 933 F.2d at 203-04 (quoting *Kelly*, 708 F.2d at 125) ("Consent to a wiretap is not voluntary where 'it is coerced, either by explicit or implicit means or by implied threat or covert force.'"). In particular, the informant was not in custody during any of the cooperation in this case (from November 20, 2007 through June 3, 2008) and was never restrained during any of the meetings with law enforcement, all of which took place in conference rooms at the DEA's local office or public places. (Docket No. 131 at 10-11, 13, 15-19, 70-72). There is also no evidence that the informant was subject to lengthy questioning, or abusive interrogation techniques such as sleep or food deprivation. (*Id.*). There

is likewise no indication in the record that the informant was subject to physical threats or abuse. (*Id.* at 12). From this Court's perspective, the evidence shows that the informant freely and willingly worked alongside the involved officers to assist in the investigation of this case.

Fourth, the facts surrounding the informant's actual recording of the challenged evidence also bolster the finding that consent was voluntarily provided. The Court finds very credible Officer Woodward's unequivocal and unrebutted testimony that the officers would not have outfitted the informant with the recording equipment on any occasion if said individual had not agreed to do so voluntarily. (Docket No. 131 at 17). He further explained that the informant wore the equipment "in a good place" such that the recordings were of good quality in nature and relatively clear.[5] (*Id.*). The informant also made no effort to thwart the recordings or disable the device, despite opportunities to do so. (*Id.* at 14). Of note, during the May 1, 2008 controlled buy, the informant left the recording device running and maintained contact with investigating officers by cell phone while he was following codefendant Bostic by car to complete the purchase. (*Id.* at 18).

Fifth, the circumstances of this case demonstrate that, at most, the informant cooperated with law enforcement based on his or her desire to "work off" the state charges and potentially reduce his or her sentencing exposure or obtain some other tangible benefit from prosecutors for cooperating. It is well-settled that an "'individual's decision to allow the police to record a phone conversation ... is not necessarily involuntary just because that individual's motives were self-seeking, or because he harbored expectations of personal benefit.'" *Antoon*, 933 F.2d at 205 (quoting *Kelly*, 708 F.2d at 125). There is no evidence that Officer Woodward or any other law

---

[5] The Court notes that defense counsel admitted that the recordings themselves have been produced by the Government as discovery materials and that he had copies of same. (Docket No. 102 at ¶ 2). But, the defense did not present the recordings during the suppression hearing to potentially challenge the quality of the recordings. As such, the Court accepts the fact that the recordings were of good quality in nature and relatively clear.

13

enforcement officer made any promises to the informant to coerce the informant to agree to record the challenged conversations. Indeed, the Court accepts Officer Woodward's testimony that law enforcement officers lack the authority to make any binding promises to informants to reduce sentencing exposure or dismiss charges. (*Id.* at 46). Therefore, as there is no evidence of coercion, the informant's motivation to cooperate by seeking a reduced sentence in state court is not by itself sufficient to invalidate consent in this case. *See Antoon*, 933 F.2d at 205.

In his post-hearing submissions, Defendant makes much of the fact that the informant was not called to testify and that the Government did not introduce any written or oral agreement whereby this individual explicitly acknowledged that the consent given to record the challenged conversations was voluntary. (Docket No. 146). He also points to the fact that Officer Woodward's testimony did not conclusively disprove that there were never any promises nor threats made to the informant by other law enforcement officers to secure his consent as Officer Woodward admitted that he had no such knowledge of any such activities taken outside of his presence. (*Id.*). Specifically, defense counsel's line of questioning at the suppression hearing appeared aimed at suggesting that Officer Lincoln may have encouraged the informant to cooperate against Defendant and perhaps, threatened to increase charges or penalties for his or her failure to do so or possibly offered to reduce the informant's sentencing exposure for helping to build a case against Defendant. (Docket No. 131 at 45-47, 53-55).

As is noted above, it was not the Government's burden to disprove every potential factor which may be considered by the Court in its analysis of the totality of the circumstances surrounding the voluntariness of the informant's consent in this case. *See Bustamonte*, 412 U.S. at 227. The Government may meet its burden to establish consent through direct or circumstantial evidence and no particular form of evidence, such as a fully executed consent

form, is required. *See Brown*, 2009 WL 1310714, at *2 (noting that the Government's "proof need not consist of testimonial evidence" and may be established through circumstantial evidence tending to show that consent was voluntary). Further, to the extent that the defense wished to rely on its theory regarding Officer Lincoln's alleged encouragement of the informant in order to undermine the Government's position on consent; these facts were not developed at the hearing as the defense offered no evidence of any kind to support this position.[6] (*See generally* Docket No. 131). However, Defendant could have subpoenaed Officer Lincoln or any of the other involved agents or officers to testify but did not do so. As it presently stands, the record is devoid of any evidence which would suggest that the informant's decision to consent to recording the subject conversations was made as a result of any improper conduct by Officer Lincoln. Thus, there is no support in the record for a finding that the decision to consent to have the conversations recorded was not made as a result of the informant's own free will.

IV. CONCLUSION

Based on the foregoing, Defendant's motion to suppress [101] is DENIED. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

---

[6] Defendant suggests that a negative inference akin to a "missing witness instruction" under Third Circuit Model Jury Instruction § 4.16 should apply here because the Government did not present all of its potential witnesses during the suppression hearing. (Docket No. 146 at 8-9). The Court disagrees. The missing witness instruction is only appropriate where the Government fails to present a witness whom is under its control. 3d Cir. Mod. J.I. § 4.16 (if "you also find that [the witness] was available as a witness only to the government and not to the defense and that the government failed to call [the witness]"); *see also United States v. Drozdowski*, 313 F.3d 819, 825 n.3 (3d Cir. 2002). While the Court entered a protective order relative to the testimony of the informant prior to the suppression hearing, Defendant could have called any number of other individuals involved in this case as witnesses to attempt to develop facts relative to consent of the informant, including, but not limited to, Officer Lincoln, ADA Dick Goldberg, or Officer Dorian Merlina (who was present at the hearing but sequestered during testimony). Further, as the Government argues in its response, (Docket No. 147), this case is at the pretrial stage and the Government's burden now is only to present evidence demonstrating that the consent of the informant was voluntary. It was not required to set forth its entire case against the Defendant by presenting all of its witnesses at this hearing.

15

Date: November 9, 2012

cc/ecf: All counsel of record.